IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ORANGEBURG DIVISION

United States of America,      )
                               )
            Plaintiff,         )
                               )
        -vs.-                  )      5:17-cr-01138-MBS-1
                               )      December 17, 2019
Joseph Roger Moultrie,         )      Columbia, SC
                               )
            Defendant.         )
_____)


BEFORE THE HONORABLE MARGARET B. SEYMOUR
UNITED STATES SENIOR DISTRICT JUDGE, PRESIDING
SENTENCING


A P P E A R A N C E S:

For the Government:        WILLIAM WITHERSPOON, AUSA
                           United States Attorney's Office
                           1441 Main Street, Suite 500
                           Columbia, SC 29201


For the Defendant:         JOHN DELGADO, ESQ.
                           WILLIAM NETTLES, ESQ.
                           Bill Nettles Law
                           2008 Lincoln Street
                           Columbia, SC 29201


Court Reporter:            Jennifer H. Williams, RPR
                           United States Court Reporter
                           901 Richland Street
                           Columbia, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

THE COURT:  All right, Mr. Witherspoon.  You may call the next case.

MR. WITHERSPOON:  Your Honor, the next case is United States of America vs. Joseph "Joe" Roger Moultrie, criminal action number 5:17-1138.  Mr. Moultrie is present with his attorneys, John Delgado and Bill Nettles.  We're here for a sentencing.  The government has reviewed the pre-sentence report and we have no objections.

THE COURT:  All right.  Thank you.

All right, Mr. Delgado and Mr. Nettles.  Have you had an opportunity to review the pre-sentence report?

MR. DELGADO:  Yes, ma'am, we have.

THE COURT:  And, Mr. Moultrie, have you also reviewed that report?

DEFENDANT:  Yes, ma'am.

THE COURT:  All right.  Are there any objections to the report?

MR. DELGADO:  Yes, ma'am.

THE COURT:  All right.  I'll hear from you at this time on your objections.

MR. DELGADO:  Your Honor, before I go any further, just to make certain that I preserve everything --

COURT REPORTER:  Would you put the microphone in front of you?

MR. DELGADO:  Yes, ma'am.  I'm sorry.

COURT REPORTER:  Thank you.

MR. DELGADO:  Your Honor, just to make certain that we have preserved everything, we again renew our motion for a new trial based on not only the motions during the trial but our pretrial motions relating to the severance of those two counts.

With that being said, Your Honor, this is a very unique case for Mr. Nettles and I.  I think, as the Court will acknowledge and as the law will acknowledge, age and infirmity is not necessarily a ground for a downward departure.

When that is coupled however -- and as I have attempted to place in our sentencing memorandum -- when that is coupled with the extraordinary costs first of Medicare and Medicaid; I must admit that, and now to the Bureau of Prisons, of a yearly benefit or a yearly cost of over $25,000 a year in addition to, as the PSR report talks about, a yearly cost to the Bureau of Prisons of $37,000 --

THE COURT:  Okay.  Let me just stop you for one second.

MR. DELGADO:  Yes, ma'am.

THE COURT:  Are you arguing objections to the pre-sentence report, or are you arguing your motion for a variance?

MR. DELGADO:  For a variance, Your Honor.  I'm

sorry.

THE COURT:  So do you have any objections to the pre-sentence report as written?

MR. DELGADO:  No, ma'am.  I'm sorry.  I thought I had said that to you.  I apologize.  I am so sorry.  But the --

THE COURT:  But since you don't have an objection to the pre-sentence report, I want to put on the record what the statutory --

MR. DELGADO:  Yes, ma'am.

THE COURT:  -- sentencing provisions are and also the guideline sentencing provisions.

There being no objections to the pre-sentence report from either the defendant or the government, the statutory provisions are as follows.  The custody minimum/maximum sentence on Count 1 is not more than thirty years, and on Count 2 not more than thirty years.  And supervised release on Count 1 is at least six years; and Count 2, at least six years.  Probation is prohibited.  And the fine on Count 1 is 2 million dollars and on Count 2 is 2 million dollars.  And the special assessment fee on Count 1 is $100, and Count 2 is $100.

The guideline provisions, the total offense level is 34 because Mr. Moultrie was determined to be a career offender.  His criminal history category is VI.  Probation is

prohibited.  The guideline range is 262 to 327 months imprisonment with six years of supervised release and a $200 special assessment fee.

Is there any objection to the statutory provisions or the guideline provisions?

MR. WITHERSPOON:  None from the government, Your Honor.

MR. DELGADO:  None from the defendant, Your Honor.

THE COURT:  The Court adopts these provisions.

And now, Mr. Delgado, you can argue your motion for a variance.

MR. DELGADO:  Your Honor, I apologize if I hopped --

THE COURT:  That's okay.  That's all right.  No problem.

MR. DELGADO:  -- or jumped in front of you.

Your Honor, costs to the government as reflected in paragraph 77 of the pre-sentence report is a standard addition that is contained in every pre-sentence investigation report that's submitted to courts in this district.  According to the report, there in paragraph 77, it costs -- just for confinement in the Bureau of Prisons, it costs a little over $37,000 a year.

With that, in the case of Mr. Moultrie -- and that is the reason for the downward variance under 3553(a)(1) -- the

cost to the government will be increased in addition to the $37,000 a cost of some $35,000 a year.

And let me explain to you -- I guess I have never really understood this because I hopefully am blessed with enough good health that this doesn't affect me on a monthly basis. Joe does not have a right eye. That was removed. I think it was in 2013. The reason that that was removed -- and I never knew this -- arthritis impacted his optic nerve and caused an ocular degeneration.

He now has in his right eye a prosthetic eye. The doctors who control that and the doctors who treat his continuing and chronic arthritis say that unless he continues with one medicine that costs almost $600 a month, something called Ri -- Rituxan, Your Honor -- R-I-T-U-X-A-N -- $600 a month to make certain that the left eye is not also impacted as he grows older.

The Rituxan, as I put in our sentencing memorandum, has been specifically recommended by his arthritis physician, Dr. Feinman in West Columbia, as necessary to make certain that the vision in his left eye is not impacted and he becomes totally blind. I didn't know that any medicine could cost $600 a month.

In addition, he has a pulmonary condition that costs him another $400 a month, or close to it. And then that's not -- he -- it costs -- Medicare/Medicaid about $1,000 a month now.

That's $12,000 a year in addition to what we believe to be the $37,000 that I believe if my math -- I'm not adding correctly. But it costs him 24,000 -- I'm sorry. I'll stand corrected by what I put in this, my --

THE COURT: 23,000.

MR. DELGADO: Yes, ma'am. That's it.

I think we are constrained by 3553(a)(1) to bring this to the Court's attention. In other words, when the pre-sentence investigation report says he is in poor health, that -- with all respect for my friends, that really is an understatement. It's more than just poor health.

And then, as I noted in the memorandum, he has a prostate cancer problem that has a 50 percent chance of reoccurring within five years.

In other words, the Butner Correctional Facility, being what it is, this will tax resources there the likes of which probably I've never had the experience of having to contend with. I'm not saying that Butner is not able and capable of doing that. I'm saying with the plethora of medical conditions that he brings to this matter -- and we're not discussing whether or not he is a career criminal and whether or not but for 14 months he would have been in that position. I am simply having to be required to talk about the gentleman who is seated next to me.

I was happy to look over at my friend's table here just

a minute ago.  They're going to probably show you pictures of
Joe walking in his yard.  Well, he can do that with the aid
of a cane.  He comes in here today on a walker.  Over level
ground, he uses that walker effectively.  Any other -- just
coming in this morning to our office was a ten-minute
procedure coming from the parking lot, which is right next to
our office, to come into our -- he's not accentuating that.
That's just how long it takes him.

He is very physically ill.  He is -- that will continue.
Some of these problems are not just acute but they are
chronic and will continue to cause an inordinate amount of
money.  That being what it is, I ask the Court to consider a
variance down to 60 months, in consideration of the cost to
the government that his illness and age necessitate.

Your Honor, I saw something last night under the --
while age again is not a necessary downward departure, cost
efficiency coupled with illness under I think it's 5H1.1
talks about whether or not -- and I'm not saying home
confinement is possible here.  I'm simply saying that now we
hand all of this to the Court to say what is a just and
reasonable sentence that's not more than necessary.  In
considering that, the Court should consider the cost that
this will have.  We ask the Court for a downward variance to
60 months.

Your Honor, I only got this this morning.  Oh.  Judge,

let me give you an example of what we're talking about. Tomorrow he goes back to the -- they call them the Hollings Cancer Center at MUSC for a checkup as to the prostate cancer. January the 8th he has left knee replacement.

Last night I sent -- or yesterday afternoon -- I sent to the government the report from Dr. Ulrich saying that he will be checked three months post surgery, which would be about April the 8th, to see how that is going and to -- we hope we'll be able to get back a report. In other words, we're not making this up. And what we have here is a very, very infirm gentleman.

I'd like to be able to pass to the Court something we just got just this morning. And I'm sorry to say that Reverend Wolfe was not able to be present here today. Reverend Wolfe is the pastor of Gethsemane Baptist Church in Cordova. As we could only say this today, he has a funeral of a member of that congregation that passed last week, and the funeral is at 11:00 this morning, and that's the reason Reverend Wolfe has submitted this letter in mitigation and discusses Mr. Moultrie's allegiance to the church and his attendance.

Your Honor, I would like to be able to ask the defendant's wife, Ms. Sharon Moultrie, to be able to address the Court.

THE COURT: That will be fine.

MRS. MOULTRIE:  Good morning.

THE COURT:  Good morning.

MRS. MOULTRIE:  I would like to just take a moment to --

THE COURT:  Can you state your name for the record?

MRS. MOULTRIE:  I'm sorry.  My name is Sharon Moultrie.

THE COURT:  All right.  Thank you.

MRS. MOULTRIE:  And my husband and I have been married for 25 years and together more than 30 of my 55 years.

I have not always been the perfect person.  Neither has Joe.  I don't condone a lot of the activities that he has involved himself in in the past.  But what I do know is that he is not the social pariah that some people have or law enforcement has dubbed him to be.  But he is a very compassionate, caring individual outside of the legalities.

His health issues have tremendously declined and are constantly deteriorating.  I balance a schedule between taking care of him and my mother as well.  And my health isn't 100 percent.  But I do take a whole lot of pride in taking care of him.

And I would like to ask or beg on the mercy of the Court any leniency and every leniency that you can see to have towards his sentencing.

So, you know, there is just a lot of -- a lot of issues that I in being a wife has [sic] to assist him with.  And like I -- clothing him, helping him get dressed every day, putting on socks, tying his shoes, strenuous things that he's unable to do, shortness of breath or helping him get in and out of the bed.  And once he's upright, he can move to get to physical therapy in order to assist him with his debilitating crippling.

So once again, I would like to just reiterate with the courts any leniency and every leniency towards helping him. I'm not going to shun his responsibility as of him being guilty or not guilty.  I'm not here to stand up and say otherwise.  But in your sentencing, if you would offer any leniency to him, it would be greatly appreciated.

THE COURT:  All right.  Thank you very much.

MR. DELGADO:  Your Honor, that would conclude our mitigation.  And I'd like to be ...

(Defendant conferring with counsel.)

MR. DELGADO:  Your Honor, I'm sorry.  But for a plane flight that was delayed from Atlanta, Ms. Maisha from Washington, D.C. -- I'm sorry.  The defendant's daughter who is Ms. Maisha Green -- Ms. Court Reporter, that's spelled M-A-I-S-H-A -- Maisha Green would have been here today.  She emailed us around 9 and said that her plain flight would be coming in at 10 -- and I dare say that's even probably been

delayed with the condition of the weather -- Ms. Green would be here today.

Ms. Green, interestingly enough, is an attorney and a prosecutor originally from Georgia.  She has dealt with us in this pre-sentence investigation report, and we believe that some of the things that she has told us about her father are reflected in our sentencing memorandum.  Thank you.

THE COURT:  Okay.  Thank you very much.

Mr. Moultrie, do you have any statements you would like to make to the Court with regard to the sentence to be imposed in your case?

DEFENDANT:  Your Honor, I am not a good talking person when it come [sic] down to expressing my feelings and stuff.  My wife, she [sic good at that.  My daughter, she [sic] coming from Washington, and she wanted to talk to you about me and my health and everything.  And she text [sic] this morning, and she [sic] supposed to be here at 9:00.  And she text [sic] this morning, said her plane is delayed.  She be here at 10:00, but she have to come from the airport here.

I'm asking the Court, could Your Honor give her a little bit more time that she could speak on my behalf?  Because I get so short of breath when I talk.  And I think if you would want to hear what she have to say, I think that would impact your decision.  Thank you.

THE COURT:  All right.  So any objection to us

continuing this and I take care of the other matters I have to take care of and come back to Mr. Moultrie?

MR. WITHERSPOON: Judge, can we -- I mean, if they are texting with her to figure out how long it's going to be, because with this weather and the weather on the east coast, it could be tomorrow.

THE COURT: But they don't have any phones. So he can't text.

MR. DELGADO: I don't know how to answer that, except we can maybe not postpone this. But maybe if there's other -- if there are other cases to be called, maybe we could take a respite for 10 or 15 minutes at least and try to --

THE COURT: That's what I was suggesting, that I take care of the other matters I have to take care of this morning and come back to Mr. Moultrie's case. Any objection to that?

MR. WITHERSPOON: No.

THE COURT: If she is not here by then, then -- is that her?

MR. NETTLES: Your Honor, just to let you know, there will be a bookend on this. I mean, what I would propose is, Ms. Moultrie doesn't have her phone. Right? Ms. Moultrie can go downstairs, text, and find out if she's at least on the ground. And we can -- and so we can at least

let us know where we are about continuing.  And we'll come back and report to the Court if she's at least on the ground in the next 10 or 15 minutes.

THE COURT:  All right.  That's fine.

(WHEREUPON, the proceedings are set aside and reconvened later as follows.)

THE COURT:  Mr. Delgado, do you have a report?

MR. DELGADO:  Your Honor, Ms. Green notified Ms. Moultrie that she was 15 minutes away.  And that was probably 25 minutes ago.

THE COURT:  Okay.  I'll take the next case and then wait.

MR. DELGADO:  Thank you.

(WHEREUPON, the proceedings are set aside and reconvened later as follows.)

THE COURT:  All right, Mr. Witherspoon.

MR. WITHERSPOON:  Your Honor, we're back on the record in the case of United States of America vs. Joe Roger Moultrie, criminal action 5:17-1138.  Mr. Moultrie is present with his attorneys, John Delgado and Bill Nettles.  We're back, returning back to the initial sentencing.

THE COURT:  All right.  All right, Mr. Delgado.

MR. DELGADO:  Your Honor, thank you for your time. We appreciate your consideration.  Your Honor, just so that I am clear on the record about my arithmetic, the Rituxan which

keeps him from losing the other eye is $23,000 a year.  Plus

he has something, a prescription for Restasis and Spiriva for

his COPD, his pulmonary obstruction.  That's 12,000 a year.

Together, it's 35,000 a year, plus the normal rate that the

Bureau of Prisons compilates to confine an individual for a

year.  I just wanted to make certain that I had placed that

adequately before the Court.

             THE COURT:  So the costs that you've just set

forth, is that with or without insurance that he has?

             MR. DELGADO:  I'm sorry, Your Honor?

             THE COURT:  Is that the costs with or without his

Medicare or Medicaid insurance?

             MR. DELGADO:  That is the cost to Medicare.

             THE COURT:  But what does he have to pay out of

pocket?

             MR. DELGADO:  A much smaller amount than that;

approximately 1800 to $2,000.

             THE COURT:  Okay.

             MR. DELGADO:  Your Honor, Ms. Maisha Green of

Washington, D.C., the defendant's daughter, is now present.

She'd like to be able to address the Court.

             THE COURT:  All right.  Ms. Green, I'll hear from

you at this time.

             MS. GREEN:  Your Honor, my name is --

             THE COURT:  Good morning.

MS. GREEN:  -- Maisha Green.  And I am here to -- first of all, I appreciate the opportunity to speak.  I'm here to speak on Joe's behalf because he was like a father to me.  Between -- I don't remember the years.  But between two and twelve years old, he and my mother dated.  They lived together.  And even though Joe -- my biological father wasn't in my life.  I wasn't very keen on Joe in the beginning.  He couldn't read me a bedtime story.  I thought my mother was too pretty for him.  And he just grew on me.

My mother told me that she fell in love with Joe because she was an LPN in the hospital and Joe was a hard-working orderly who cleaned up vomit, and she just felt like he was a good man.  And she didn't mind his country ways.  And she also told me that he couldn't read and write and that's why he couldn't read me a story.

So as I grew up, he was there for me at parent/teacher conferences.  He was there for my honors and awards ceremonies.  He was there for me at Girl Scout ventures.  He was always there for me and he showed up.  So I'm showing up today because he showed up for me.

I was able to be school president, go to college, go to law school, become a prosecutor.  And I've seen what the judicial system is like for disadvantaged men like himself.  And so it's very emotional for me.  But please forgive me.

But I just beg of you that you would find leniency in

his sentence, because a painful death in prison is not fit for his sentencing. He has cancer. He's been suffering health-wise for a long time. He's a good person. He's been in house arrest or he's been at home with his ankle bracelet without incident.

And I ask that you consider his health and that the sentencing does not equate to the crime. And he is not a violent criminal that we have to worry about, and he's certainly not going to flee. He needs the good health care so that he can live out his remaining years in peace. Thank you.

THE COURT: All right. Thank you very much. Can you spell your first name for us, please? We didn't catch it.

MS. GREEN: It's spelled M-A-I-S-H-A.

THE COURT: Okay. Thank you.

MR. DELGADO: That's all, Your Honor. Thank you.

THE COURT: Thank you. All right. Anything else from the defense? Anything from you, Mr. Nettles? Okay. Anything else from the government?

MR. WITHERSPOON: Mary, can we turn on the monitor? Your Honor, I've listened --

THE CLERK: They're on.

MR. WITHERSPOON: They're on? I've listened to the defense talk about Mr. Moultrie's medical issues. Your

Honor, I have a video here from last week where Mr. Moultrie went to the doctor. Unbeknownst to him, we were watching him. I would like to play that for the Court, play both of them.

That's the person, Mr. Moultrie. That's his wife going in. And you'll see him coming in who today is walking with -- barely able to move with his walker. You notice today he has his oxygen tank and has the tube on.

You will notice in the second video, there is -- it went off. There it is. You'll see he is again walking with a cane. The oxygen tank is in his arm but he doesn't have it on. You'll also notice today he is wearing a brace on his right arm. There, unbeknownst to him, there is no brace on his arm.

Your Honor, in August, I was at the Providence Northeast Medical facility when Mr. Moultrie came in. And when he came in that day, I noticed that he was walking with a cane, with no oxygen tank, and with no one following him.

I asked Probation, Mr. Dean, from that date forward to watch Mr. Moultrie when he goes to visit him to see if he's walking with -- because if you remember during the trial, Judge -- and it's very vivid for me -- he came in every day with his walker, with his oxygen tank, and with his brace on his hand.

One day he came in during trial. There was jurors

downstairs.  Mr. Moultrie presumably had to take his shoes off and he said he couldn't tie his shoes.  But here it is a month or two after the trial.  He is able to ambulate with no issues.  He may have COPD; but here last week, not wearing oxygen.  He has a tank with him but it's not on.  Today, a week later, we are wearing all of this.

And, Judge, I think this is for sympathy reasons.  I'm not denying he has some health issues.  We all have health issues.  I am a cancer survivor who is still living with cancer.

We also have evidence that he drives himself around without his wife who says that she has to put his clothes on and get him up and get him moving around.  I'm not saying that he doesn't have health issues, but his health issues didn't prevent him from committing these two crimes.  These health issues, COPD and the prostate cancer and the loss of his eye didn't prevent him from committing these two crimes.

Ms. Green says that he's not a bad person.  But if you look at the pre-sentence report, Judge, since two-thousand-and -- since 1976, he has been associated with drugs.

Again, I'm not here to talk about Mr. Moultrie and his health issues.  But his health issues do not override the fact that he committed two federal offenses.  He knew what he was doing.  In both cases the jury has determined that the

drugs belonged to him.  He knew what he was doing, but he continued to do it.

I tell you, Judge, in paragraph 28 of the pre-sentence report, he was terminated from supervised release on July 21st, 2017.  So when he committed these two offenses, he was either on supervised release or had just been let off supervised release.  But he petitioned the Court to get off, saying he is not involved in these crimes anymore.

Mr. Moultrie has some health issues, Judge, but so do a lot of other people in the BOP.  I remember a person that this Court sentenced several years ago who was in a wheelchair who had lost an eye as a result of an accident.  That person is still surviving in the Bureau of Prison.  The Bureau of Prison is certainly capable of taking care of his health issues.

And as far as the expense of his upkeep, well, the government is paying for that upkeep as it is now.  As you see in his pre-sentence report, he is on disability getting $300-a-month disability payments.  So the government is taking care -- already taking care of those other responsibilities.  Those other costs are already being covered by the government.

I don't think his health issues -- we haven't talked about the 3553(a) factors, because all of those fit and require, I think lend itself to being able to allow him to go

to prison.

Your Honor, as Mr. Jeremy Dean said, on August, 28th, he had a cane and he had no breathing machine on.  On September 26th, he had a walker but no oxygen.  The October 8th, he had a breathing tube but no cane or walker.  October 30th, he had a cane and an oxygen tank on.

But last week, last Thursday when he went to see Dr. Ulrich for consultation for his surgery, he's walking with a cane.  He's ambulatory without any hesitation.  His wife was walking ahead of him.  She wasn't even concerned enough to care for him, to see if he would need help.  But today and during the whole trial he is wearing, Judge -- I say for sympathy -- this oxygen tank with the walker and the brace.

Judge, 262 months may be a long time.  The government would not be -- would not oppose a variance.  But we're not -- we do oppose a five-year variance.  Judge, I think ten years, a variance down to ten years, would be sufficient.

I know the defense is also going to ask, Judge, for him to remain out pending appeal.  We would oppose that.  I've talked to the Marshals.  He is scheduled for surgery in January.  But they said because of his health issues, it's going to take two to three months before the Bureau of Prison actually can designate him.  If he has the surgery in January, two or three months, Judge, would be sufficient.  At that point he could self report to the BOP.

THE COURT: Okay. Thank you.

MR. NETTLES: Your Honor.

THE COURT: Yes.

MR. NETTLES: May I just -- may I just briefly address the characteristics of the little short video that we just watched? Number one, I'd point out in speaking with my client that he says that whether he uses a cane or a walker is by two factors: Number one, how far he's going to have to walk; and, number two, how he feels on the day, because it's primarily driven by arthritis. So some days his arthritis is really bad and some days it's not. Days he knows he's going to have to make a significant walk, he always uses his walker.

That would be evidenced by the other dates whenever he was meeting with the pre-sentence folks. I mean, some days, whenever he felt like, you know, his arthritis was such. So the fact -- I would just ask the Court to -- you know, the other thing I'd point out is, if you notice how short a walk it was, he was able to park in the handicap and walk over.

You know, when you look at the totality of the evidence, even, you know, the pre-sentence folks, I mean, they talk about how, yeah, some days -- and some days he needs his breathing stuff; other days he doesn't. All right.

When he comes here, yeah, he wears all that. Right? Primarily because it's a pretty good walk by the time we get

to park someplace.  And, secondly, he doesn't know what's going to happen.  If he doesn't have his oxygen with him, he's in a very bad situation.  That's not always the case when he's going to the doctor's office.

So I don't -- the health concerns that Mr. Moultrie has are very, very real and are documented.  I would just ask the Court not to -- you know, the concerns we've raised about health are documented and legitimate.  All right.  And, no, that didn't cause him to deal drugs, but we wouldn't be doing our job if we didn't fully develop and provide the Court with the information necessary to make an informed decision on that issue.

THE COURT:  All right.  Thank you very much.

MR. WITHERSPOON:  And just a short comment.  The days that pretrial, Mr. Dean saw him, he was at his house, at Mr. Moultrie's house.  He wasn't using oxygen then, Judge. Here, he was not using oxygen.  It seems that the oxygen use is dependent upon him coming to court.

MR. NETTLES:  That's even better.  If he was at home, I'm sure he had -- I'm sure -- I mean, nobody said his oxygen wasn't in the house.  And the other thing, too, about oxygen.  You've got to have a -- I mean, you don't just go to the pharmacy and say, hey, give me an oxygen tank.  I mean, a doctor has written him a prescription to get an oxygen tank to use PRN.  That's not that uncommon.  And so, I mean, it

would be different if the visit had been done at the house and, oh, he wasn't on his oxygen. I mean, he only uses it when he needs it.

THE COURT: All right. Thank you.

MR. WITHERSPOON: And, finally, the Bureau of Prison does have the oxygen tanks for him.

THE COURT: All right. You may stand for sentencing. All right. Mr. Moultrie, having calculated and considered the advisory sentencing guidelines and having also considered the relevant statutory sentencing factors that are contained in Title 18, United States Code, Section 3553(a), it is the judgment of the Court that the defendant, Joseph Roger Moultrie, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 120 months. This term consists of 120 months as to Count 1 and 120 months as to Count 2, said terms to run concurrently.

The defendant shall forfeit his interest in property as directed in the Preliminary Order of Forfeiture. Has that been filed? There's no forfeiture?

MR. WITHERSPOON: No, ma'am.

THE COURT: Okay. It appears the defendant does not have the ability to pay a fine. Therefore, the fine is waived. The defendant shall pay the mandatory $200 special assessment fee consisting of $100 as to each count which is due and payable immediately.

Upon release from imprisonment, the defendant will be placed on supervised release for a period of three years. This term consists of three years as to Count 1 and three years as to Count 2, said terms to run concurrently.

Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the Probation Office in the district to which he is released. And while he is on supervised release, he shall comply with the mandatory and standard conditions of supervision outlined in Title 18, United States Code, Section 3583(d), and he shall also comply with the following special conditions for the reasons set forth in the pre-sentence report which is adopted, incorporated by reference.

He shall submit to substance abuse testing to determine if he has used a prohibited substance. He shall pay for or contribute to the cost of such program not to exceed an amount determined reasonable by the court-approved U.S. Probation Office's sliding scale for services, and he will cooperate in securing any applicable third-party payment such as insurance or Medicaid.

In imposing this sentence, I have granted the defendant's motion for a variance and I have considered the factors contained within Title 18, United States Code, Section 3553(a). And I have specifically considered the history and characteristics of the defendant pursuant to

Title 18, United States Code, Section 3553(a)(1).

The defendant is in extremely poor physical condition and suffers from extensive medical issues, including his rheumatoid arthritis which requires his quarterly infusions. I have also considered the fact that the defendant suffers from stage two prostate cancer and he may need additional treatment. He suffers from COPD. And he's scheduled for knee replacement surgery. And I've considered all of those factors in granting the variance and feel that the sentence is adequate deterrence under the circumstances.

The findings of fact of the pre-sentence report are adopted and incorporated by reference.

Any objection to the form of the sentence?

MR. WITHERSPOON: None from the government.

MR. NETTLES: No, Your Honor.

THE COURT: I would make a recommendation to the Bureau of Prisons that he be incarcerated at a medical facility. And I'm also going to allow him to remain on bond. The same terms and conditions will apply.

MR. WITHERSPOON: Your Honor, how long are you allowing him to stay out on bond?

THE COURT: Until a bed is ready for him at Butner or some other medical facility.

MR. WITHERSPOON: Thank you, Your Honor.

THE COURT: Okay. Anything else?

MR. NETTLES:  Nothing, Your Honor.

THE COURT:  Mr. Moultrie, I'm advising you that a criminal defendant has the right to appeal a sentence under certain circumstances.  You should discuss carefully with your lawyer as to whether or not you're entitled to an appeal in this case.  With few exceptions, any notice of appeal must be filed within 14 days after judgment in your case is entered.  Do you understand?

DEFENDANT:  Yes.  Can I say something else, Your Honor?

THE COURT:  Yes.

DEFENDANT:  Would you -- if I get out of prison, can I have instead of probation home confinement?  May I be sentenced to home confinement?

THE COURT:  You'll be on supervised release and that will be something that you'll have to discuss with your probation officer at the time.  Okay.  Thank you.

MR. NETTLES:  Thank you, Your Honor.

(WHEREUPON, the proceedings are concluded.)

* * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

s/Jennifer H. Williams

_____          January 30, 2020

Jennifer H. Williams, RPR